FILED

99 SEP 30 AM 10: 59

U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
SEP 30 1999

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | | |
|---|---|---|
| JOHN P. CAMPBELL, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | CASE NO. CV 97-B-2312-NW |
| | } | |
| CRAVEN CROWELL, as Director of | } | |
| the Tennessee Valley Authority, | } | |
| | } | |
| Defendant. | } | |

## MEMORANDUM OPINION

Currently before the court is defendant Craven Crowell's Motion for Partial Summary Judgment, Motion for Judgment on the Pleadings, and Amended Motion for Summary Judgment. For purposes of this opinion, the court will consider all of defendant's motions as one Motion for Summary Judgment. The present action arises out of claims by plaintiff John P. Campbell ("Campbell") that his former employer, the Tennessee Valley Authority ("TVA"), discriminated against Campbell because of his disability in violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 791, 794a (1994). Additionally, Campbell alleges TVA violated the Rehabilitation Act by retaliating against him for filing an EEO Complaint. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's motion is due to be granted.

### I. FACTUAL SUMMARY

Plaintiff, John P. Campbell, is employed by TVA as a machinist in TVA's Power Service Shop ("PSS"). (1st Cherry Aff., Campbell Dep. at 6.) He has held this position for over 20

years. (*Id.*) Campbell claims he was discriminated against on the basis of his disability when (1) he was told to travel to Browns Ferry Nuclear Plant to attend training in violation of his medical restrictions;[1] (2) he was denied the opportunity to serve as dual-rate foreman; and (3) he was not selected for a foreman position pursuant to Vacancy Position Announcement (VPA) 9381.

On April 30, 1992, Campbell injured his back for the second time. (Pl. Ex. A.) Campbell was treated by Dr. Macon Landers, his private physician, who placed certain physical restrictions on Campbell, including a five-pound weight limit, limited stooping and bending, and no climbing. Campbell was also treated for an anxiety disorder and severe hypertension. As a result, Campbell was placed on a "no off-reservation travel" restriction. (1st Cherry Aff., Campbell Dep. at 30-31; Pl. Ex. A.) Despite these restrictions, Campbell continued to perform his duties and responsibilities as a machinist. (1st Cherry Aff., Campbell Dep. at 143; Pl. Ex. E ¶ 3.)

Campbell filed his first EEO complaint with TVA on May 4, 1993, alleging discrimination on the basis of disability. (Pl. Ex. B.) This complaint was settled on September 10, 1993. (Pl. Ex. C.) In August 1993, Charles W. Comer ("Comer"), a witness to the settlement agreement between Campbell and TVA, became Campbell's supervisor. (Pl. Ex. D, Comer Dep. at 5-6.) In the Spring of 1995, Comer arranged for PSS to perform maintenance work for onsite nuclear plant equipment, and asked Campbell to attend training for this type of work at Brown's Ferry Nuclear Plant ("BFNP"), the only location offering the necessary classes. (1st Cherry Aff., Comer Sworn Stmt. at 118-19.) The majority of those who had already been

---

[1] Campbell further alleges that this action caused him to receive a less favorable Annual Service Review and caused him to be rejected for a foreman position. (Pl. Opp. Br.)

trained were unavailable for these onsite assignments because they were already committed to a rotating travel schedule. (*Id.* at 118-19; 1st Cherry Aff., Batchelor Sworn Stmt. at 143.) Campbell objected to this assignment and told management he would not go due to the physical and mental restrictions placed upon him by his personal physician. (Pl. Ex. F, Campbell Aff. ¶ 5; 1st Cherry Aff. Campbell Sworn Stmt. at 37-38.) After Campbell's refusal, Comer told Campbell that if he was medically approved to travel and still refused to go, he would be disciplined. (*Id.*).

At the end of May of 1995, Comer was succeeded by Richard Whiteside ("Whiteside") as Campbell's supervisor. (Pl. Ex. I, Whiteside Dep. at 4-5.) Whiteside told Comer he would continue to try to get Campbell to attend training at BFNP. (*Id.* at 5-6.) On June 13, 1995, Dr. Landers again informed PSS management of Campbell's restrictions. (Pl. Exhibit H.) However, at the request of PSS management, Campbell was evaluated and approved to travel by TVA medical representative, Dr. Bobby King. (1st Cherry Aff., Campbell Dep. at 77-78; Pl. Ex. I, Whiteside Dep. at 6.)

Thus, in June 1995, management again directed Campbell to attend the BFNP nuclear training. Campbell still refused. Dr. King then retired and was replaced by Dr. John O'Toole. (1st Cherry Aff. Sworn Stmt. at 87; Pl. Ex. I, Whiteside Dep. at 7-9.) Dr. Landers spoke with Dr. O'Toole on June 19, 1995. (Pl. Exhibit H at 10.) At PSS Management's direction, Dr. O'Toole reviewed Campbell's case and informed management that Campbell should not travel. (1st Cherry Aff. Whiteside Sworn Stmt. at 95-96.) PSS Management then discontinued its efforts to get Campbell to attend the BFNP training. (*Id.*) Campbell was not disciplined for his earlier refusals to travel to BFNP (*Id.*)

3

Also in June 1995, PSS posted VPA 9381 announcing one or more vacant Foreman positions in the Machine Shop. (Pl. Exhibit N). Twenty-three TVA employees, including Campbell, applied. (Pl. Ex. G at 20;[2] Pl. Ex. I, Whiteside Dep. at 35.) Whiteside made the selection. (*Id.*). He did not conduct formal interviews, but instead developed a selection matrix in order to rank the applicants in the areas of leadership, diversity, experience, and capabilities. (*Id.* at 22, 32.) He also reviewed each applicant's personal history record (PHR), which included service reviews and certain training records. (*Id.* at 32.) Campbell's overall score was 50, while the eight applicants actually selected had scores ranging from 110 to 200. (1st Cherry Aff. at 204-05.)

In August 1995, Campbell was given less favorable ratings on his Annual Service Review than he had previously received. (Pl. Ex. F, Campbell Aff. at ¶ 7.) Campbell learned that two of the ratings originally filled out by Mr. Davis had been lowered by his new supervisor, Whiteside. (*Id.*) Whiteside attached a hand-written note to the review form that stated, "Campbell currently has an outstanding unresolved EEO Complaint against management." (Pl. Ex. K, Davis Dep. at 6-8; Pl. Ex. L.) Whiteside did not know of Campbell's 1993 EEO Complaint, but he knew that Campbell had filed, or intended to file, a complaint against management regarding the travel incident. ( Pl. Ex. I, Whiteside Dep. at 16.) Campbell filed his second EEO Complaint in September 1995. (*Id.*) He then filed this action against Craven Crowell, as Director of TVA, on February 24, 1998.

---

[2] Although this information appears under Pl. Ex. F, it is clear Plaintiff intended it to be included as Pl. Ex. G, as Plaintiff's exhibits skip from F to H. For purposes of this opinion, the court will treat it as Exhibit G.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgement, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. DISCUSSION

### A. Disability Discrimination

#### 1. Prima Facie Case

Campbell has failed to make out a prima facie case of disability discrimination. The Rehabilitation Act provides, "No otherwise qualified individual with a disability . . . shall, solely

by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794. To establish a prima facie case of disability discrimination under the Rehabilitation Act, a plaintiff must prove the following elements: (1) he or she is "disabled" within the meaning of the Act and relevant regulations, (2) he or she is "otherwise qualified" for the position in question, (3) he or she worked for a Program or activity that received federal financial assistance, and (4) he or she was adversely treated solely because of his or her disability. *Jackson v. Veterans Admin.*, 22 F.3d 277, 278 (11th Cir. 1994) (citations omitted). Campbell has failed to satisfy the first prima facie element for a claim brought under the Rehabilitation Act.

An individual is disabled for purposes of the Rehabilitation Act if he or she "(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. §705(20)(B). Thus, there are three elements included in the term "disability:" (1) "physical or mental impairment," (2) "substantially limits," and (3) "major life activities." *Sutton, et al. v. United Airlines, Inc.*, 119 S.Ct. 2139, 2145 (1999) (citing 29 C.F.R. § 1630.2(h)-(j)).

The applicable regulations provide that "physical impairment" includes "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine." 29 C.F.R. § 1630.2(h)(1). Further, "major life

activities" include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 29 C.F.R. § 1614.203(a)(3). "Substantially limits" is construed under the regulations to mean that an individual is "(i) [u]nable to perform a major life activity that the average person in the general population can perform; or (ii) [s]ignificantly restricted as to the condition, manner, or duration under which [that] individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1).

Additionally, the term "substantially limits" as it relates to the major life activity of work means:

> significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i); *See Also Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 912 (11th Cir. 1996). The EEOC has also identified certain factors that courts should consider when determining whether an individual is substantially limited in the major life activity of working, "including the geographical area to which the individual has reasonable access, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within the geographical area, from which the individual is also disqualified." *Sutton,* 119 S.Ct. at 2151 (citing 29 C.F.R. §§ 1630.2(j)(3)(ii)(A),(B)). Further, the determination of whether an individual has a disability is an individualized inquiry. *Sutton,* 119 S.Ct. at 2147 (citing *Bragdon v. Abbott*, 524 U.S. 624 (1998) and 29 C.F.R. pt. 1630, App. § 1630.2(j)). To withstand summary

judgment, Campbell must provide this court with evidence that his "particular impairment constitutes ... a significant barrier to employment." *Webb v. Garelick Mfg. Co.,* 94 F.3d 484, 488 (8th Cir. 1996) (citation omitted).

Campbell asserts that the severe hypertension, chronic back pain syndrome, and severe anxiety neurosis from which he suffers, and the accompanying restrictions which were placed upon him, i.e., five pound weight limit, limited bending, stooping, and climbing, and no off reservation travel, substantially limit his ability to perform his job. However, Campbell has not provided any evidence to demonstrate how he is substantially limited in his ability to work. An impairment that concerns only a narrow class of jobs may be determined not to constitute a major life activity at all, or alternatively, not to substantially limit a major life activity. *Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723, 727 (5th Cir. 1995) (citing *Jasany v. United States Postal Service,* 755 F.2d 1244, 1249 n. 3 (6th Cir. 1985) (interpreting the Rehabilitation Act)). As the Supreme court has explained:

> [t]o be substantially limited in the major life activity of working, [] one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Sutton,* 119 S.Ct. at 2151; *See Also Witter v. Delta Air Lines, Inc.,* 138 F.3d 1366 (11th Cir. 1998). Campbell has presented no evidence that his restrictions prevent him from performing an entire class of jobs. The restrictions placed upon him establish only that he must avoid heavy lifting and climbing, and that he must engage in a limited amount of bending and stooping.

8

The record clearly shows that Campbell's medical restrictions have not substantially limited his ability to perform the work he has performed throughout his employment with TVA. Campbell admitted in his deposition testimony that he is capable of performing his job.[3] Further, Campbell's private physician stated in a letter to the TVA medical representative that Campbell is able to continue performing his regular duties.[4] Because jobs were available which Campbell could perform, he is not precluded from a broad range of jobs as required under the Act. *See Sutton,* 119 S.Ct. at 2151. Although Campbell may suffer from a "physical or mental impairment" that qualifies under the Act, based upon the evidence in the record, no reasonable person in the exercise of impartial judgment could conclude that Campbell's impairment substantially limited his ability to work. *See Swain v. Hillsborough County School Board,* 146 F.3d 855, 858 (11th Cir. 1998) ("Although a plaintiff seeking recovery under the ADA is not required to provide a comprehensive list of jobs which she cannot perform, the person must provide some evidence beyond the mere existence and impact of a physical impairment to survive summary judgment.") (citations omitted). Thus, because Campbell has not shown that he has a condition which substantially limits a major life activity, he is not "disabled" within the meaning of the Rehabilitation Act.

Similarly, there is no "record" of such an impairment. The records of Campbell's medical restrictions do not establish that his impairments substantially limit the major life

---

[3] "I have this anxiety problem or neurosis . . . but I'm not to the extent that I'm neurotic. I'm capable of doing my job." (1st Cherry Aff., Campbell Dep. at 143-44).

[4] "I feel he is handicapped . . . I do feel that [Campbell] can continue to perform his duties as a machinist in his current capacity at the TVA reservation and he tells me they are able to keep him busy constantly during his work hours with the tasks that they ask him to perform there." (Pl. Exhibit E).

activity of working. *See Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1121 (5th Cir. 1998) (noting that prior back surgery and leave of absence tend to prove record of impairment, but do not show that such impairment substantially limits a major life activity); *Ray v. Glidden Co.,* 85 F.3d 227, 229 (5th Cir. 1996) (concluding doctor's note restricting claimant to ten-pound lifting restriction did not establish a record of impairment limiting a major life activity).

Finally, Campbell has not shown that he is "regarded as" having such an impairment. Instead of actually having a disability or a record of a disability, an individual may be "regarded as" having an "impairment." The EEOC Guidelines separate the definition of the phrase "regarded as having such an impairment" into three separate categories:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such a limitation;
(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
(3) Has none of the impairments defined in paragraphs (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(*l*). Regardless of which category a particular case falls under, "it is necessary that a covered entity entertain misperceptions about the individual -- it must believe either that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton,* 119 S.Ct. at 2150. With respect to "perceived impairments," the Eleventh Circuit has observed: "As with real impairments, courts have held that a perceived impairment must be substantially limiting and significant. In this context, then, a significant impairment is one that is viewed by the employer as generally foreclosing the type of employment involved, not just a

narrow range of job tasks." *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 913 (11th Cir. 1996) (citations omitted).

The record would not permit a reasonable fact finder to determine that Campbell was regarded by TVA as having an impairment that substantially limited his ability to work. Campbell was employed by TVA for over twenty years. TVA management, and in particular, Campbell's supervisor's knew of his limitations. The record contains three items of evidence which could form the basis of TVA's perception of Campbell and his condition: (1) the 1993 EEO Complaint, in which Campbell checked the "handicap" box (2nd Cherry Aff. at 5; Pl. Exhibit B); (2) testimony from both Campbell and his supervisors that TVA management knew Campbell had been placed on certain restrictions (Pl. Ex. D, Comer Dep. at 9-12; Pl. Ex. F, Campbell Aff. ¶5; Pl. Ex. I, Whiteside Dep. at 7-9); and (3) the letter from Campbell's personal physician indicating Campbell's limitations. (Pl. Exhibit H.) However, there is no evidence that TVA machinists were required to engage in the activities from which Campbell was restricted, and Campbell admitted that he was capable of performing his job. (Pl. Ex. F, Campbell Aff. ¶ 7; 1st Cherry Aff., Campbell Dep. at 143-144.)

The provision pertaining to perceived disabilities "is intended to combat the effects of 'archaic attitudes,' erroneous perceptions, and myths that work to the disadvantage of persons with or regarded as having disabilities." *Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir. 1995). The record indicates that Campbell was able to perform the duties of a machinist, and was not perceived, by himself or his superiors, to be disabled. Additionally, it is apparent that TVA management did not consider Campbell disabled since he was not awarded diversity points, in accordance with TVA's affirmative action plan, when he was being considered for the

11

Foreman Position.[5]  Further, Campbell has not shown he was unable to perform the class of jobs offered at TVA. *See Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1370 (11th Cir. 1998) ("[T]o establish that Delta perceived him as unable to perform the relevant 'class of jobs,' Witter would have to prove Delta regarded him as unable to perform not just the job of being a pilot, but also the non-piloting jobs . . ."). Thus, Campbell has not demonstrated that TVA "regarded" him as having an impairment that substantially limited his ability to work.  Since Campbell does not have a disability which substantially limits a major life activity, nor does he have a record of such an impairment, nor is he regarded as having such an impairment, his claim does not fall within the protection of the Rehabilitation Act.

### 2. Legitimate, Nondiscriminatory Reason

Assuming arguendo that Campbell has established a prima facie case, TVA has succeeded in articulating legitimate, nondiscriminatory reasons for the allegedly unlawful actions. TVA wanted to extend its operations to onsite maintenance work, and they needed to train personnel for this type of work at the BFNP site. TVA management had no reason to discredit their own medical representative's determination that Campbell could travel. As to the dual-rate foreman position, TVA explained that (1) Campbell had previously declined to serve as a dual-rate, and had not subsequently informed the foremen that he was again interested in holding this position; and (2) there are a number of qualified individuals ready to serve as a dual-rate, and each individual foreman chooses his own substitute according to his particular style and

---

[5] (1st Cherry Aff. Sworn Stmt. at 204-05, Campbell Dep. at 100-02).

preference for carrying out the job.[6] Further, TVA Supervisor Whiteside did not select Campbell to a foreman position due to the legitimate, nondiscriminatory reason that Campbell simply was not among the most qualified for the job.

### 3. Pretext

Had Campbell been successful in establishing a prima facie case, his claim would still fail in that he is unable to establish that TVA's stated lawful reasons for the alleged adverse actions were a pretext for disability discrimination. Under "pretext" analysis, the court is governed by the familiar, tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir. 1997) (clarifying the standard to be applied under Eleventh Circuit jurisprudence). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Burdine*, 450 U.S. at 252-53. If the plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant "to articulate a legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant succeeds in carrying this burden, then the plaintiff must prove that the defendant's articulated reasons are a mere pretext for unlawful motives (i.e., discrimination or retaliation). *Burdine*, 450 U.S. at 253. A plaintiff's prima facie case coupled with sufficient evidence to allow a fact finder to disbelieve the employer's proffered explanation for its actions is enough to preclude entry of judgment as a matter of law. *See Combs*, 106 F.3d at 1529; *Benson v. Tocco*,

---

[6] (1st Cherry Aff., Comer Sworn Statement at 126 and Trousdale Sworn Statement at 153-154).

13

*Inc.*, 113 F.3d 1203, 1207 (11th Cir. 1997). At all times, the plaintiff bears the burden of persuasion on the ultimate question of whether the defendant acted with an unlawful motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

Even if Campbell had established a prima facie case, he has not produced evidence sufficient to discredit in the mind of a reasonable juror any of the nondiscriminatory reasons advanced by TVA for its actions. Campbell alleges he suffered adverse treatment through TVA's assignment of him to travel to BFNP for training in violation of his work restrictions, failure to allow him to serve as a dual-rate foreman, and failure to promote him to foreman. However, he has not carried his burden of showing the reasons articulated by TVA for these actions are pretextual.

The evidence shows that Campbell was asked to travel to BFNP for training so that PSS would have trained personnel to perform maintenance work for onsite nuclear plant equipment. Campbell was twice assigned to attend the BFNP training, and both times he refused, reasoning it violated the restrictions his personal physician had placed upon him. PSS management requested that Campbell be examined by the TVA medical representative, who determined that Campbell could travel. PSS had no reason to discredit this determination, and thus reassigned Campbell to travel to BFNP. When the successor medical representative concluded that Campbell should not travel, PSS management withdrew this assignment. Campbell was not disciplined. Neither his job capacity nor his compensation was affected, and Campbell continues to hold the same position. The reasonable belief that Campbell could travel coupled with the necessity of such travel establishes a legitimate reason for any adverse action, which Campbell has failed to rebut.

14

Assuming Campbell's lack of opportunity to serve as a dual-rate foreman is characterized as an actionable employment decision or practice made by TVA, Campbell has failed to come forward with any evidence to rebut TVA's legitimate, nondiscriminatory explanations for such action. The decision as to who could serve as a dual-rate foreman was made by the particular crew foreman to be replaced.[7] There was no requirement placed upon the crew foremen by TVA as to whom they were to utilize as a dual-rate foreman. Further, several times when Campbell was asked to serve as a dual-rate foreman, he refused.[8] Thus, it appears anomalous that Campbell would claim he was discriminated against by his own refusal to serve as a dual-rate foreman. In any event, Campbell has come forward with no evidence to discredit the reasons articulated by TVA for his lack of occasion to serve as a dual-rate foreman.

Likewise, Campbell also has failed to provide sufficient evidence showing that he was denied one of the eight foreman positions advertised in the VPA 9381 on the basis of some unlawful reason. Campbell received a much lower score than those selected for the position and has not pointed to any evidence, other than his own opinion, indicating that his score should have been higher. The evidence shows that Campbell simply was not among the most qualified applicants for the foreman position. Further, even if he had been as qualified as the applicants actually selected, "[t]he employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." *Burdine*, 450 U.S. 248, 259 (1981). Campbell has failed to show that the selection of the foreman vacancies was based on unlawful

---

[7] A dual-rate foreman serves as a temporary foreman in the crew foreman's absence. (1st Cherry Aff., Trousdale Sworn Stmt. at 152-54).

[8] (1st Cherry Aff.: Batchelor Dep. at 13, 15-16; Campbell Dep. at 149-51; Davis Dep. at 5-6).

15

criteria. Thus, Campbell has failed to meet his burden in coming forward with sufficient evidence to preclude entry of judgment as a matter of law.

## B. Retaliation

Campbell has also failed to present sufficient evidence from which a reasonable jury could find that he was a victim of retaliation in violation of the § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. The court is again governed by the familiar, tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir. 1997) (clarifying the standard to be applied under Eleventh Circuit jurisprudence).

In order to establish a prima facie case of retaliation, Campbell must demonstrate that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. *Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1454 (11th Cir. 1998). Campbell alleges he was retaliated against for filing his first EEO Complaint on May 4, 1993, and for refusing to travel to BFNP for training. He relies on the same evidence used to support his claim for disability discrimination, i.e., that over a period of almost two years he was assigned to travel to the BFNP in violation of his medical restrictions, he was not given the opportunity to serve as a dual-rate foreman, and that he was not selected to fill one of the eight vacant foreman positions at the PSS.

Campbell has failed to establish a prima facie case of retaliation involving his assignment to travel to BFNP for training. The directive that Campbell travel was reasonable and resulted in no disciplinary or adverse treatment of Campbell. An individual claiming

discrimination under the Rehabilitation Act may look to the remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-16) in obtaining judicial relief. 29 U.S.C. § 794a(a)(1); *Treadwell v. Alexander*, 707 F.2d 473, 475 n.3 (11th Cir. 1983). This Circuit has held that "Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions." *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998). However, ". . . there is some threshold level of substantiality that must be met for unlawful discrimination to be cognizable under the anti-retaliation clause . . . ."*Id.* Campbell has failed to satisfy this threshold level regarding his claim that the directive to travel to BFNP for training was a form of retaliation for filing the 1993 EEO complaint.

Further, even if this action is deemed adverse treatment, Campbell has not shown a causal connection between the adverse action and the protected expression. "[F]or the link to be made, it must be reasonable to assume that the employer had cause to retaliate." *Mize v. Jefferson City Board of Education*, 93 F.3d 739, 745 (11th Cir. 1996) (citation omitted). Campbell filed his first EEO Complaint in May 1993. TVA's directive that he travel to BFNP for training occurred in May and June of 1995. Because of this extensive interval of time, it is not reasonable to infer that the protected activity was the cause of the alleged adverse employment actions.

Even had Campbell established a prima facie case of retaliatory discrimination in being assigned to travel, he has failed to rebut TVA's legitimate reason for this action. TVA needed to train personnel for this particular type of work, and Campbell was one of a limited number available for such training. TVA personnel approved Campbell for travel. Campbell has not

shown that TVA's reasoning was pretextual. Further, the directive that Campbell travel was reasonable and resulted in no disciplinary or discriminatory treatment of Campbell.

Campbell has also failed to establish a prima facie case of retaliation regarding TVA's selections for the foremen positions advertised in VPA 9381. Campbell claims he was not selected for a foreman position in retaliation for his filing a complaint against TVA management and for his refusal to travel to BFNP for training. Even though the causal link requirement is interpreted broadly, *see Meeks v. Computer Associates International,* 15 F.3d 1013, 1021 (11th Cir. 1994), Campbell has failed to establish a causal relation between the protected conduct and the adverse employment decision. As the Eleventh Circuit has explained:

> Where termination closely follows protected activity, it is usually reasonable to infer that the activity was the cause of the adverse employment decision. . . . It does not follow, however, that every time a person engages in constitutionally protected activity within a short time prior to an adverse employment decision that an inference may reasonably be drawn that they were related. Every act of expression is not equally as likely to draw a negative response from an employer as every other; for the link to be made, it must be reasonable to assume that the employer had cause to retaliate.

*Mize v. Jefferson City Board of Education,* 93 F.3d 739, 745 (11th Cir. 1996) (interpreting the causal link requirement in a § 1983 First Amendment and Rehabilitation Act retaliation case) (citations omitted). It is not reasonable to infer that Campbell's filing of the first EEO Complaint caused him to be denied the foreman position for two reasons: (1) the significant lapse of time between the two events, and (2) Whiteside, who was responsible for making the selections, did not know about the 1993 Complaint. Further, there is no reasonable evidence to suggest that TVA management had any reason to retaliate against Campbell for his refusal to

travel. Once the TVA medical representative determined Campbell should not travel, TVA management withdrew the directive.

Even if there was evidence on which a jury could reasonably infer a causal link between Campbell's refusal to travel and TVA's decision not to select him for a foreman position, Campbell's retaliation claim would still fail in that TVA has articulated a legitimate, nondiscriminatory reason for Campbell's rejection. He simply was not among the most qualified. Campbell has failed to offer any reliable evidence showing that he was among the most qualified for this position. Thus, Campbell has failed to meet his burden of showing TVA acted with an unlawful motive.

The fact that Campbell was not selected as a dual-rate foreman as often as he would have preferred also does not support a claim of retaliation. As previously explained, Campbell's lack of opportunity to serve as a dual-rate foreman is not an adverse employment action attributable to TVA. Even if it were, Campbell has offered no evidence to refute TVA's legitimate reasoning that (1) Campbell had previously declined to serve as a dual-rate, and had not subsequently informed the foremen he would resume serving in this position; and (2) each individual foreman was responsible for choosing his own substitute.

Additionally, the court is unpersuaded by Campbell's argument that the note and lowered score on his evaluation sheet are the result of, or in any way indicate evidence of, retaliation on the part of TVA. Campbell has not offered any evidence that he suffered adversely or that his position was in any way altered as a result of the notation on his evaluation sheet. Further, Campbell filed his second EEO Complaint in September, and has shown no adverse treatment

19

occurring after that time. Therefore, the second EEO Complaint cannot serve as the basis for a retaliation claim.

Campbell has not established a prima facie case of retaliation, nor has he shown that TVA's stated explanations for the allegedly unlawful actions were pretextual. Therefore, defendant's motion for summary judgement is due to be granted.

### IV. CONCLUSION

Upon consideration of all the evidence in the case, the court concludes that there is no genuine issue of material fact and that defendant's motion for summary judgment is due to be granted. An order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this 30th day of September, 1999.

*[signature]*
**SHARON LOVELACE BLACKBURN**
United States District Judge